## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
## BALTIMORE DIVISION

In re:

| | |
|---|---|
| **MEGAN E. ALLEN,** | **CHAPTER 7** |
| **DEBTOR.** | **CASE NO. 19-15508** |

**SPECIALIZED LOAN SERVICING LLC, AS SERVICING AGENT FOR CITIGROUP MORTGAGE LOAN TRUST INC., MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-10, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE,**

**MOVANT,**

**vs.**

**MEGAN E. ALLEN**
**and ZVI GUTTMAN, TRUSTEE,**

**RESPONDENTS.**

### MOTION FOR RELIEF FROM THE AUTOMATIC STAY
### (REAL PROPERTY LOCATED AT 7798 NE 8TH COURT, BOCA RATON, FL 33487)

Specialized Loan Servicing LLC, as servicing agent for Citigroup Mortgage Loan Trust Inc., Mortgage Pass-Through Certificates, Series 2007-10, U.S. Bank National Association, as Trustee ("Movant") hereby moves this Court, pursuant to 11 U.S.C. §362, for relief from the automatic stay with respect to certain real property of the Debtor having an address of **7798 NE 8th Court, Boca Raton, FL 33487, also referred to as 7798 NE Spanish Trail Ct, Boca Raton, FL 33487** (the "Property"), for all purposes allowed by the Note (defined below), the Mortgage (defined below),and applicable law, including but not limited to the right to foreclose. In further support of this Motion, Movant respectfully states:

1.      A petition under Chapter 7 of the United States Bankruptcy Code was filed with respect to the Debtor on April 23, 2019.

2.      The Debtor has executed and delivered or is otherwise obligated with respect to that certain promissory note in the original principal amount of $1,250,000.00 (the "Note"). A copy of the Note is attached hereto as Exhibit A.

3.      Pursuant to that certain Mortgage (the "Mortgage"), all obligations (collectively, the "Obligations") of the Debtor under and with respect to the Note and the Mortgage are secured by the Property and the other collateral described in the Mortgage. The lien created by the Mortgage was perfected by recording of the Mortgage in the office of the Clerk of the County of Palm Beach, Florida. A copy of the recorded Mortgage is attached hereto as Exhibit B.

4.    Specialized Loan Servicing LLC services the loan on the Property referenced in this Motion. In the event the automatic stay in this case is modified, this case dismisses, and/or the Debtor obtains a discharge and a foreclosure action is commenced on the mortgaged property, the foreclosure will be conducted in the name of Movant or Movant's successor or assignee. Movant, directly or through an agent, has possession of the Note. The Note is either made payable to Movant or has been duly endorsed. Movant is the original mortgagee or beneficiary or the assignee of the Mortgage/Deed of Trust.

5.    As of May 1, 2019, the unpaid principal balance due is $1,248,749.77 and the approximate outstanding amount of Obligations less any partial payments or suspense balance is $1,547,773.66.

6.    The following chart sets forth the number and amount of payments due pursuant to the terms of the Note as of May 1, 2019:

| Number of Payments | From | To | Monthly Payment Amount | Total Amounts Delinquent |
|---|---|---|---|---|
| 1 | 01/01/2016 | 01/01/2016 | $3,121.87 | $3,121.87 |
| 4 | 02/01/2016 | 05/01/2016 | $8,021.54 | $32,086.16 |
| 4 | 06/01/2016 | 09/01/2016 | $8,541.86 | $34,167.44 |
| 8 | 10/01/2016 | 05/01/2017 | $6,584.50 | $52,676.00 |
| 4 | 06/01/2017 | 09/01/2017 | $10,591.99 | $42,367.96 |
| 8 | 10/01/2017 | 05/01/2018 | $9,986.65 | $79,893.20 |
| 4 | 06/01/2018 | 09/01/2018 | $10,470.41 | $41,881.64 |
| 8 | 10/01/2018 | 05/01/2019 | $10,128.90 | $81,031.20 |
| Less partial payments: | | | | ($0.00) |
| | | | **Total Payments:** | **$367,225.47** |

7.    As of May 1, 2019, the total arrearage/delinquency is $390,796.08, consisting of (i) the foregoing total of payments in the amount of $367,225.47, plus (ii) the following fees:

| Fee Description | Amount |
|---|---|
| Attorney's Fees and Other Costs | $23,570.61 |

8.    A payment history is attached hereto as Exhibit 1.

9.    The estimated value of the Property is $1,200,000.00. The basis for such valuation is: Broker's Price Opinion, a copy of which is attached hereto as Exhibit C.

10.    Cause exists for relief from the automatic stay for the following reasons:

    i.    Movant's interest in the Property is not adequately protected.

    ii.    Pursuant to 11 U.S.C. §362(d)(2)(A), the Debtor has no equity in the Property; and pursuant to §362(d)(2)(B), the Property is not necessary for an effective reorganization.

WHEREFORE, Movant prays that this Court issue an Order terminating or modifying the stay and granting the following:

1.      Relief from the stay for all purposes allowed by applicable law, the Note, and the Mortgage, including but not limited to allowing Movant to proceed under applicable non-bankruptcy law to enforce its remedies to foreclose upon and obtain possession of the Property and any and all other collateral pledged under the Mortgage.

2.      That the 14-day stay described by Bankruptcy Rule 4001(a)(3) be waived.

3.      For such other relief as the Court deems proper.


Dated: May 2, 2019

                                SPECIALIZED LOAN SERVICING LLC, AS
                                SERVICING AGENT FOR CITIGROUP
                                MORTGAGE LOAN TRUST INC., MORTGAGE
                                PASS-THROUGH CERTIFICATES, SERIES
                                2007-10, U.S. BANK NATIONAL ASSOCIATION,
                                AS TRUSTEE


                                By: /s/Randa S Azzam___
                                Randa S. Azzam, Esquire, Bar No. 22474
                                John E. Driscoll, Esquire, Bar No. 17161
                                Michael T. Freeman, Esquire, Bar No. 19131
                                Daniel J. Pesachowitz, Esquire, Bar No. 14906
                                Samuel I. White, P.C.
                                611 Rockville Pike
                                Suite 100
                                Rockville, MD 20852
                                Tel: (301) 804-3400
                                Fax: (301) 838-1954
                                RAzzam@siwpc.com


## CERTIFICATE OF SERVICE

I certify that on  May 2, 2019, the foregoing Motion was served via CM/ECF on Zvi Guttman, Trustee, and John C. Schropp, Counsel for Debtor, at the email addresses registered with the Court, and that a true copy was mailed via first class mail, postage prepaid, to Megan E. Allen, Debtor, 1508 Brewster Gate Road, Crownsville, MD 21032.

                                /s/Randa S Azzam_____
                                Randa S. Azzam, Esquire
                                Samuel I. White, P. C.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

**In re:**

**MEGAN E. ALLEN,**                                                    **CHAPTER 7**

       **DEBTOR.**                                              **CASE NO. 19-15508**

**SPECIALIZED LOAN SERVICING LLC, AS
SERVICING AGENT FOR CITIGROUP MORTGAGE
LOAN TRUST INC., MORTGAGE PASS-THROUGH
CERTIFICATES, SERIES 2007-10, U.S. BANK
NATIONAL ASSOCIATION, AS TRUSTEE,**

       **MOVANT,**

**vs.**

**MEGAN E. ALLEN
and ZVI GUTTMAN, TRUSTEE,**

       **RESPONDENTS.**

**NOTICE OF MOTION AND OPPORTUNITY TO OBJECT TO MOTION
FOR RELIEF FROM THE AUTOMATIC STAY AND HEARING THEREON**

      Specialized Loan Servicing LLC, as servicing agent for Citigroup Mortgage Loan Trust Inc., Mortgage Pass-Through Certificates, Series 2007-10, U.S. Bank National Association, as Trustee ("Movant"), has filed papers with the court seeking relief from the automatic stay of 11 U.S.C. §362(a) to enable it to proceed to foreclose on its Mortgage referencing the subject property known as **7798 NE 8th Court, Boca Raton, FL 33487, also referred to as 7798 NE Spanish Trail Ct, Boca Raton, FL 33487**.  Your rights may be affected.  You should read these papers carefully and discuss them with your lawyer, if you have one in this bankruptcy case.  (If you do not have a lawyer, you may wish to consult one.).

      If you do not want the court to grant the motion for relief from the stay, or if you want the court to consider your views on the motion, then by **May 16, 2019** (parties served by mail may add three (3) additional days to the response deadline) you or your lawyer must file a written response with the Clerk of the Bankruptcy Court explaining your position and mail a copy to:

            Randa S. Azzam               Zvi Guttman
            611 Rockville Pike            P.O. Box 32308
            Suite 100                   Baltimore, MD 21282-2308
            Rockville, MD 20852

      If you mail a copy rather than deliver your response to the Clerk of the Bankruptcy Court for filing, you must mail it early enough so that the Court will receive it by the date stated above.

      The hearing is scheduled for **June 21, 2019 at 9:15 AM,** in the United States Bankruptcy Court for the District of Maryland, 101 West Lombard Street, Baltimore, MD 21201, **Courtroom 1-B.**

IF YOU OR YOUR LAWYER DO NOT TAKE THESE STEPS BY THE DEADLINE, THE COURT MAY DECIDE THAT YOU DO NOT OPPOSE THE RELIEF SOUGHT IN THE MOTION AND MAY GRANT OR OTHERWISE DISPOSE OF THE MOTION BEFORE THE SCHEDULED HEARING DATE.

DATE SERVED:  May 2, 2019

By: /s/Randa S Azzam___
Randa S. Azzam, Esquire, Bar No. 22474
John E. Driscoll, Esquire, Bar No. 17161
Michael T. Freeman, Esquire, Bar No. 19131
Daniel J. Pesachowitz, Esquire, Bar No. 14906
Samuel I. White, P.C.
611 Rockville Pike
Suite 100
Rockville, MD 20852
Tel: (301) 804-3400
Fax: (301) 838-1954
RAzzam@siwpc.com

CERTIFICATE OF SERVICE

I certify that on May 2, 2019, the foregoing Notice of Motion was served via CM/ECF on Zvi Guttman, Trustee, and John C. Schropp, Counsel for Debtor, at the email addresses registered with the Court, and that a true copy was mailed via first class mail, postage prepaid, to Megan E. Allen, Debtor, 1508 Brewster Gate Road, Crownsville, MD 21032.

**/s/Randa S Azzam**_____
Randa S. Azzam, Esquire
Samuel I. White, P. C.

Exhibit A

# InterestFirst™ADJUSTABLE RATE NOTE
(One-Year LIBOR Index (As Published In *The Wall Street Journal*)
Rate Caps - 10 Year Interest Only Period)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

| | | |
|---|---|---|
| 04/13/07 | Miami | Florida |
| [Date] | [City] | [State] |

7798 NE 8th Court
Boca Raton, FL  33487
[Property Address]

### 1.  BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $    1,250,000.00    (this amount is called 'Principal'), plus interest, to the order of Lender. Lender is

HomeBanc Mortgage Corporation

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2.  INTEREST
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      6.375      %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3.  PAYMENTS
(A) Time and Place of Payments
I will make a payment on the first day of every month, beginning on    June    1    2007    . Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.

I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on    May    1    2037    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at    P.O. Box 105434    Atlanta, GA 30348-5434

or at a different place if required by the Note Holder.

MULTISTATE InterestFirst ADJUSTABLE RATE NOTE - ONE-YEAR LIBOR INDEX - 10 Yr. Interest Only Period - Single Family - Fannie Mae Uniform Instrument
Amended for Florida

-197N(FL) (0505)
VMP Mortgage Solutions, Inc. (800)521-7291

Form 3535.6/06

Page 1 of 5
197N15.fm Rev. (11/05)

Initials:

Represents Redacted Information

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $    6,640.63    until the first Change Date. After the first Change Date, my monthly payment will be in an amount sufficient to pay accrued interest, at the rate determined as described in Section 4 of this Note until the First Principal and Interest Payment Due Date. On that date and thereafter, my monthly payment will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of changes in monthly payment.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

**4.    ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of May    2012    , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the First Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding    Two and One Fourth    percentage points (    2.250    %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of my monthly payment. For payment adjustments occurring before the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay all accrued interest each month on the unpaid principal balance at the new interest rate. If I make a voluntary payment of principal before the First Principal and Interest Payment Due Date, my payment amount for subsequent payments will be reduced to the amount necessary to repay all accrued interest on the reduced principal balance at the current interest rate. For payment adjustments occurring on or after the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay unpaid principal and interest that I am expected to owe in full on the Maturity Date at the current interest rate in substantially equal payments.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than    11.375    % or less than    2.250    %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than    12.375    %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be that date which is the 10th anniversary date of the first payment due date, as reflected in Section 3(A) of the Note.

MULTISTATE ... Frm Rev  (1/7/05)
VMP®-197N(FL) (0506)

Page 2 of 5

Form 3535   5/05
Initials _____
04/12/07
16:15:12

5.   BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

6.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

7.   BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    15      calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        5.000       % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

8.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.



Form 3535 6/06
IM
M.R.

10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

12. **DOCUMENTARY TAX**
   The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
Stephen Allen                    -Borrower        Megan B Allen                    -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                         -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                         -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                         -Borrower

*[Sign Original Only]*

Pay to the Order of

Without Recourse
HomeBanc Mortgage Corporation

_____
Angelina McDonald
Limited Vice President

11978SFL.frm Rev (11/05)
VMP ®-197N(FL) (0605)

Page 5 of 6

Form 3535 8/05
04/12/07
15 19:12

# Exhibit B

CFN 20070196364
OR BK 21655 PG 0128
RECORDED 04/24/2007 07:40:18
Palm Beach County, Florida
AMT 1,250,000.00
Deed Doc 4,375.00
Intang 2,500.00
Sharon R. Bock,CLERK & COMPTROLLER
Pgs 0128 - 153; (26pgs)

Return To:

HomeBanc Mortgage Corporation
ATTN: Final Documents
PO Box 105930
Atlanta, GA 30348-5930

This document was prepared by:

HomeBanc Mortgage Corporation
2002 Summit Blvd.
Suite 100
Atlanta, GA 30319

——————————— [Space Above This Line For Recording Data] ———————————

## MORTGAGE



### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated          April          13  2007
together with all Riders to this document.
(B) "Borrower" is
    Stephen Allen,
    Megan E Allen, His wife

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is      HomeBanc Mortgage Corporation

Lender is a      Corporation
organized and existing under the laws of      The State of Delaware

FLORIDA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3010 1/01

-6(FL) (0005)
Page 1 of 16                      Initials
VMP MORTGAGE FORMS - (800)521-7291

106-01FL.02 frm

04/12/07
16:19:13 P
Stephen Allen

Represents Redacted Information

Lender's address is      2002 Summit Blvd.    Suite 100
                         Atlanta, GA  30319

Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated   April      13 2007 .
The Note states that Borrower owes Lender  One Million Two Hundred Fifty Thousand and
no/100-------------------------------------------------------- Dollars
(U.S. $   1,250,000.00  ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than   05/01/37 .

(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [X] Second Home Rider |
| [ ] Balloon Rider | [X] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

-6(FL) (0005)    Page 2 of 16    Form 3010  1/01

106-027_10 frm

04/12/07
16:19:13 F
Stephen Allen

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in the      County          [Type of Recording Jurisdiction]
of      Palm Beach      , Florida      [Name of Recording Jurisdiction]:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

7798 NE 8th Court          which currently has the address of
          Boca Raton                                  [Street]
("Property Address");      [City] , Florida      33487      [Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."



-6(FL) (0005)          Page 3 of 16          Initials:          Form 3010   1/01

IDS-03FL10 frm          04/12/07
                        16:18:13 F
                        Stephen Allen

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment

can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest

106-0SFL10.frm

04/12/07
16:15:13 P
Stephen Allen

shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

VMP -6(FL) (0005)    Page 6 of 16    Form 3010  1/01

106-06FL10.frm

04/12/07
16:19:13 F
Stephen Allen

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

-6(FL) (0005)                          Page 5 of 16                    Form 3010   1/01

304-05FL10 firm

04/12/07
16:19:14 F
Stephen Allen

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

-6(FL) (0005)                    Page 8 of 16                    Initials: [signature]    Form 3010    1/01

106-08F110 f2m

04/12/07
16:19:14 9
Stephen Allen

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

Initials: [handwritten]

105-00FL10.frm

04/12/07
16:19:14 P
Stephen Allen

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender s security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender s satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of

any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers

Initials: ___

unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the

105-12F7.10.5rm.

04/12/07
16:19:14  F
Stephen Allen

purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the 'Loan Servicer') that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) 'Hazardous Substances' are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) 'Environmental Law' means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

-6(FL) (0005)    Page 13 of 16    Form 3010   1/01

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Attorneys' Fees. As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

25. Jury Trial Waiver. The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

Initials: ___

04/12/07
16:19:14 P
Stephen Allen

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____ (Seal)
Stephen Allen                    -Borrower

_____ (Address)

_____ (Seal)
Megan B Allen                    -Borrower

_____ (Address)

_____ (Seal)          _____ (Seal)
-Borrower                               -Borrower

_____ (Address)       _____ (Address)

_____ (Seal)          _____ (Seal)
-Borrower                               -Borrower

_____ (Address)       _____ (Address)

_____ (Seal)          _____ (Seal)
-Borrower                               -Borrower

_____ (Address)       _____ (Address)

106-15FL.0.fsm

04/12/07
15:19:14 P
Stephen Allen

Palm Beach

STATE OF FLORIDA,                                              County ss:
    The foregoing instrument was acknowledged before me this  4/13/07        by

Stephen Allen and Megan E. Allen

who is personally known to me or who has produced                    as identification.

                                                    _____
                                            Notary Public

LISA GLASSMAN
MY COMMISSION # DD 443806
EXPIRES  October 23, 2009
Bonded Thru Notary Public Underwriters

-6(FL) (0005)                          Page 16 of 16              Form 3010   1/01

156-16710.fm                                          04/12/07
                                                      16:19:14 F
                                                      Stephen Allen

# Exhibit A

Lot 609, 4th SECTION, TROPIC ISLE, according to the Plat thereof recorded in Plat Book 25, Pages 69 and 70, of the *Public Records of Palm Beach County, Florida.*

# SECOND HOME RIDER

THIS SECOND HOME RIDER is made this     13th   day of   April     2007   , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower" whether  there are one or more persons undersigned) to secure Borrower's Note to HomeBanc Mortgage Corporation

(the "Lender") of the same date and covering the Property described in the Security Instrument (the "Property"), which is located at:

7790 NE 8th Court
Boca Raton, FL   33487
[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that Sections 6 and 8 of the Security Instrument are deleted and are replaced by the following:

6. Occupancy. Borrower shall occupy, and shall only use, the Property as Borrower's second home. Borrower shall keep the Property available for Borrower's exclusive use and enjoyment at all times, and shall not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Borrower either to rent the Property or give a management firm or any other person any control over the occupancy or use of the Property.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's second home

MULTISTATE SECOND HOME RIDER - Single Family -
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Page 1 of 2

Form 3890 1/01

Initials: 

-365R (0011)                       VMP MORTGAGE FORMS - (800)521-7291

04/12/07
16:19:19
Stephen Allen

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Second Home Rider.

_____ (Seal)
Stephen Allen                    - Borrower

_____ (Seal)
Megan E Allen                    - Borrower

_____ (Seal)
                                 - Borrower

_____ (Seal)
                                 - Borrower

_____ (Seal)
                                 - Borrower

_____ (Seal)
                                 - Borrower

_____ (Seal)
                                 - Borrower

_____ (Seal)
                                 - Borrower

365R (0011)                     Page 2 of 2                     Form 3890 1/01

04/12/27
16:19:18
Stephen Allen

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this     13th     day of
     April     2007     , and is incorporated into and shall be
deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security
Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to
HomeBanc Mortgage Corporation
2002 Summit Blvd.    Suite 100
Atlanta, GA   30319                                        (the
"Lender") of the same date and covering the Property described in the Security Instrument and located at:

7798 NE 8th Court
Boca Raton, FL   33487

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other
such parcels and certain common areas and facilities, as described in
covenants, conditions and restrictions

(the "Declaration"). The Property is a part of a planned unit development known as
TROPIC ISLE

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent
entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the
uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security Instrument,
Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's
Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of
incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii)
any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when
due, all dues and assessments imposed pursuant to the Constituent Documents.

MULTISTATE PUD RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3150 1/01
Page 1 of 3                                                    Initials:
7R (0008)                    VMP MORTGAGE FORMS - (800)521-7291

04/12/07
16:19:19
Stephen Allen

B. **Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

C. **Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

D. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

E. **Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

F. **Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Initials: _____

04/12/07
16:19:20
Stephen Allen

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD
Rider.

_____ (Seal)        _____ (Seal)
Stephen Allen                         -Borrower        Megan B Allen                         -Borrower

_____ (Seal)        _____ (Seal)
                                      -Borrower                                              -Borrower

_____ (Seal)        _____ (Seal)
                                      -Borrower                                              -Borrower

_____ (Seal)        _____ (Seal)
                                      -Borrower                                              -Borrower


-7R (0008)                          Page 3 of 3                          Form 3150 1/01


04/12/07
16:19:20
Stephen Allen

# FIXED/ADJUSTABLE RATE RIDER

(LIBOR One-Year Index (As Published In *The Wall Street Journal*)- Rate Caps
- Ten - Year Interest Only Period)

THIS FIXED/ADJUSTABLE RATE RIDER is made this 13th day of April    2007
 , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given
by the undersigned ('Borrower') to secure Borrower's Fixed/Adjustable Rate Note (the
' Note") to            HomeBanc Mortgage Corporation

("Lender") of the same date and covering the property described in the Security Instrument
and located at:            7798 NE 8th Court
                          Boca Raton, FL   33487
                          [Property Address]

THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST
RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE
AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT
ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial fixed interest rate of      6.375  %. The Note also
provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the
first day of    May       2012     , and the adjustable interest rate I will pay may change
on that day every 12th month thereafter. The date on which my initial fixed interest rate
changes to an adjustable interest rate, and each date on which my adjustable interest rate
could change, is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an
Index. The "Index' is the average of interbank offered rates for one-year U.S.

MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Ten-Year Initial
Interest Only Period - Single Family - Fannie Mae Uniform Instrument
Form 3153 2/06
VMP -197R (0603)
Page 1 of 4        Initials:
VMP Mortgage Solutions, Inc.

119701.frm Rev (08/06)

dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two and One Fourth                                                      percentage points ( 2.250           %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of my monthly payment. For payment adjustments occurring before the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay all accrued interest each month on the unpaid principal balance at the new interest rate. If I make a voluntary payment of principal before the First Principal and Interest Payment Due Date, my payment amount for subsequent payments will be reduced to the amount necessary to repay all accrued interest on the reduced principal balance at the current interest rate. For payment adjustments occurring on or after the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay unpaid principal and interest that I am expected to owe in full on the Maturity Date at the current interest rate in substantially equal payments.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 12.375    % or less than        2.250        %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than        12.375        %.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

(G) Date of First Principal and Interest Payment

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be that date which is the 10th anniversary date of the first payment due date, as reflected in Section 3(A) of the Note.

B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

-197R (0603)                    Page 2 of 4                    Form 3153 2/06
119782.frm Rev. (08/06)

Initials: _____

04/12/07        16:13:20
Stephen Allen

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

197R (0603)                     Page 3 of 4                     Form 3153 2/06

Initials:

:197R3 fm Rev. 108/06)

04/12/07   :6:19:21
Stephen Allen

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)
Stephen Allen                          -Borrower

_____ (Seal)
Megan E Allen                          -Borrower

_____ (Seal)
                                        -Borrower

_____ (Seal)
                                        -Borrower

_____ (Seal)
                                        -Borrower

_____ (Seal)
                                        -Borrower

_____ (Seal)
                                        -Borrower

_____ (Seal)
                                        -Borrower

-197R (0603)                Page 4 of 4                Form 3153 2/06

1197R4.frm Rev.(08/06)

04/12/07    16:19:21
Stephen Allen

CFN 20160009580
OR BK 28039 PG 1147
RECORDED 01/11/2016 10:17:52
Palm Beach County, Florida
AMT
Sharon R. Bock
CLERK & COMPTROLLER
Pg 1147; (1Pgs)

## ASSIGNMENT

STATE OF GEORGIA, COUNTY OF FULTON

Prepared By:    HomeBanc Mortgage Corporation
PO Box 105830
Atlanta, GA 30348-5830

AFTER RECORDATION RETURN TO ABOVE

LOAN NUMBER: ▮▮▮▮▮▮▮

FOR VALUE RECEIVED,    **HomeBanc Mortgage Corporation**

, (Assignor), a corporation organized and doing business under the laws of the State of Delaware , having its office and principal place of business at 2002 Summit Boulevard, Suite 100 Atlanta, GA 30319-1497 , hereby sells, assigns, transfers and sets over to U.S. Bank National Association, as Trustee for Citigroup Mortgage Loan Trust, Inc., Mortgage Pass-Through* (Assignee), its successors and/or assigns, all its rights, title and interest in and to a certain Mortgage dated April 13, 2007 , executed by Stephen Allen, Megan E Allen, his wife *Certificates, Series 2007-10 at 60 Livingston Ave., St.Paul, MN 55107 Recorded on:04/24/07 in the principal sum of $ 1,250,000.00 and filed for record in the Office of the Clerk of Circuit Court of Palm Beach County, Florida, and recorded under Clerk's File No. 20070196364 , aforesaid records. The Assignor specifically sells, assigns, transfers and sets over to the Assignee, its successors and assigns, the aforesaid Mortgage, the property described therein, the indebtedness secured thereby, with all powers, options, privileges and immunities therein contained. The Assignor has this day sold and endorsed to the Assignee, the Note secured by the aforesaid Mortgage, and this Assignment is made to secure the Assignee, its successors and assigns, in the payment of the said Note. **IN WITNESS WHEREOF**, the Assignor has hereunto set its hand and affixed its seal by and through its seal and its duly authorized officers, this 18th day of April 2007 . Book:21655 Page:0128

Property Address: 7798 NE 8th Court, Boca Raton, FL 33487

The foregoing instrument was acknowledged before me this 4/18/07

by Ann Line McDonald who is personally known to me and have produced drivers licenses identification and did not take an oath

Signed, Sealed and Delivered in the presence of:

WITNESS

STATE

BY: _Ann McDonald_

Ann Line McDonald
Limited Vice President

ATTEST

BY: _____

NOTARY PUBLIC

COUNTY

FL-ASSIGN.fsm
Form MLSIGNFL ( Rev. 12/01)

04/18/07
10:09:22
Stephen Allen
7798 NE 8th Court

Represents Redacted Information

**Exhibit 1**

**PAYMENTS RECEIVED**

| Creditor: | Specialized Loan Servicing LLC |
|---|---|
| Debtor: | Megan E. Allen |
| Case No.: | 19-15508 |
| Loan No.: | ▬▬▬ |
| Our File No.: | ▬▬▬ |
| Collateral: | 7798 NE 8th Court<br>Boca Raton, FL 33487 |

| | | |
|---|---|---|
| Loan Status as of: | | 5/1/2019 |
| Initial Due Date: | | 10/1/2015 |

| Date Received | Received | Due Date | Amount Due | NSF/Late Charges/Other | Paid Over/Short | Description |
|---|---|---|---|---|---|---|
| | $ - | 10/1/2015 | $ 3,122.26 | $ - | $ (3,122.26) | Payment Accrued |
| 10/14/2015 | $ 3,122.26 | | | $ | $ 3,122.26 | Funds Received |
| | $ - | 11/1/2015 | $ 3,121.87 | $ - | $ (3,121.87) | Payment Accrued |
| | $ - | 12/1/2015 | $ 3,121.87 | $ - | $ (3,121.87) | Payment Accrued |
| | $ - | 1/1/2016 | $ 3,121.87 | $ - | $ (3,121.87) | Payment Accrued |
| 1/7/2016 | $ 6,555.92 | | | $ | $ 6,555.92 | Funds Received |
| 1/7/2016 | $ - | | | $ (312.18) | $ (312.18) | Late Fees |
| | $ - | 2/1/2016 | $ 8,021.54 | $ - | $ (8,021.54) | Payment Accrued |
| | $ - | 3/1/2016 | $ 8,021.54 | $ - | $ (8,021.54) | Payment Accrued |
| | $ - | 4/1/2016 | $ 8,021.54 | $ - | $ (8,021.54) | Payment Accrued |
| | $ - | 5/1/2016 | $ 8,021.54 | $ - | $ (8,021.54) | Payment Accrued |
| | $ - | 6/1/2016 | $ 8,541.86 | $ - | $ (8,541.86) | Payment Accrued |
| | $ - | 7/1/2016 | $ 8,541.86 | $ - | $ (8,541.86) | Payment Accrued |
| | $ - | 8/1/2016 | $ 8,541.86 | $ - | $ (8,541.86) | Payment Accrued |
| | $ - | 9/1/2016 | $ 8,541.86 | $ - | $ (8,541.86) | Payment Accrued |
| | $ - | 10/1/2016 | $ 6,584.50 | $ - | $ (6,584.50) | Payment Accrued |
| | $ - | 11/1/2016 | $ 6,584.50 | $ - | $ (6,584.50) | Payment Accrued |
| | $ - | 12/1/2016 | $ 6,584.50 | $ - | $ (6,584.50) | Payment Accrued |
| | $ - | 1/1/2017 | $ 6,584.50 | $ - | $ (6,584.50) | Payment Accrued |
| | $ - | 2/1/2017 | $ 6,584.50 | $ - | $ (6,584.50) | Payment Accrued |
| | $ - | 3/1/2017 | $ 6,584.50 | $ - | $ (6,584.50) | Payment Accrued |
| | $ - | 4/1/2017 | $ 6,584.50 | $ - | $ (6,584.50) | Payment Accrued |
| | $ - | 5/1/2017 | $ 6,584.50 | $ - | $ (6,584.50) | Payment Accrued |
| | $ - | 6/1/2017 | $ 10,591.99 | $ - | $ (10,591.99) | Payment Accrued |
| | $ - | 7/1/2017 | $ 10,591.99 | $ - | $ (10,591.99) | Payment Accrued |
| | $ - | 8/1/2017 | $ 10,591.99 | $ - | $ (10,591.99) | Payment Accrued |
| | $ - | 9/1/2017 | $ 10,591.99 | $ - | $ (10,591.99) | Payment Accrued |
| | $ - | 10/1/2017 | $ 9,986.65 | $ - | $ (9,986.65) | Payment Accrued |
| | $ - | 11/1/2017 | $ 9,986.65 | $ - | $ (9,986.65) | Payment Accrued |
| | $ - | 12/1/2017 | $ 9,986.65 | $ - | $ (9,986.65) | Payment Accrued |
| | $ - | 1/1/2018 | $ 9,986.65 | $ - | $ (9,986.65) | Payment Accrued |
| | $ - | 2/1/2018 | $ 9,986.65 | $ - | $ (9,986.65) | Payment Accrued |
| | $ - | 3/1/2018 | $ 9,986.65 | $ - | $ (9,986.65) | Payment Accrued |
| | $ - | 4/1/2018 | $ 9,986.65 | $ - | $ (9,986.65) | Payment Accrued |
| | $ - | 5/1/2018 | $ 9,986.65 | $ - | $ (9,986.65) | Payment Accrued |
| | $ - | 6/1/2018 | $ 10,470.41 | $ - | $ (10,470.41) | Payment Accrued |
| | $ - | 7/1/2018 | $ 10,470.41 | $ - | $ (10,470.41) | Payment Accrued |
| | $ - | 8/1/2018 | $ 10,470.41 | $ - | $ (10,470.41) | Payment Accrued |
| | $ - | 9/1/2018 | $ 10,470.41 | $ - | $ (10,470.41) | Payment Accrued |
| | $ - | 10/1/2018 | $ 10,128.90 | $ - | $ (10,128.90) | Payment Accrued |
| | $ - | 11/1/2018 | $ 10,128.90 | $ - | $ (10,128.90) | Payment Accrued |
| | $ - | 12/1/2018 | $ 10,128.90 | $ - | $ (10,128.90) | Payment Accrued |
| | $ - | 1/1/2019 | $ 10,128.90 | $ - | $ (10,128.90) | Payment Accrued |
| | $ - | 2/1/2019 | $ 10,128.90 | $ - | $ (10,128.90) | Payment Accrued |
| | $ - | 3/1/2019 | $ 10,128.90 | $ - | $ (10,128.90) | Payment Accrued |
| | $ - | 4/1/2019 | $ 10,128.90 | $ - | $ (10,128.90) | Payment Accrued |
| | $ - | 5/1/2019 | $ 10,128.90 | $ - | $ (10,128.90) | Payment Accrued |
| **Total:** | $ 9,678.18 | | $ 376,591.47 | $ (312.18) | $ (367,225.47) | |

| Delinquent Payments | | Days Delinquent: | 1216 | |
|---|---|---|---|---|
| Month Due | P&I Due | Escrow Due | Stip Due | Total Due |
| 1/1/2016 | $ 3,121.87 | $ - | $ - | $ 3,121.87 |

▬ Represents Redacted Information ▬

| Date | Amount 1 | Amount 2 | | Total |
|---|---|---|---|---|
| 2/1/2016 | $ 3,121.87 | $ 4,899.67 | $ - | $ 8,021.54 |
| 3/1/2016 | $ 3,121.87 | $ 4,899.67 | $ - | $ 8,021.54 |
| 4/1/2016 | $ 3,121.87 | $ 4,899.67 | $ - | $ 8,021.54 |
| 5/1/2016 | $ 3,121.87 | $ 4,899.67 | $ - | $ 8,021.54 |
| 6/1/2016 | $ 3,642.19 | $ 4,899.67 | $ - | $ 8,541.86 |
| 7/1/2016 | $ 3,642.19 | $ 4,899.67 | $ - | $ 8,541.86 |
| 8/1/2016 | $ 3,642.19 | $ 4,899.67 | $ - | $ 8,541.86 |
| 9/1/2016 | $ 3,642.19 | $ 4,899.67 | $ - | $ 8,541.86 |
| 10/1/2016 | $ 3,642.19 | $ 2,942.31 | $ - | $ 6,584.50 |
| 11/1/2016 | $ 3,642.19 | $ 2,942.31 | $ - | $ 6,584.50 |
| 12/1/2016 | $ 3,642.19 | $ 2,942.31 | $ - | $ 6,584.50 |
| 1/1/2017 | $ 3,642.19 | $ 2,942.31 | $ - | $ 6,584.50 |
| 2/1/2017 | $ 3,642.19 | $ 2,942.31 | $ - | $ 6,584.50 |
| 3/1/2017 | $ 3,642.19 | $ 2,942.31 | $ - | $ 6,584.50 |
| 4/1/2017 | $ 3,642.19 | $ 2,942.31 | $ - | $ 6,584.50 |
| 5/1/2017 | $ 3,642.19 | $ 2,942.31 | $ - | $ 6,584.50 |
| 6/1/2017 | $ 7,649.68 | $ 2,942.31 | $ - | $ 10,591.99 |
| 7/1/2017 | $ 7,649.68 | $ 2,942.31 | $ - | $ 10,591.99 |
| 8/1/2017 | $ 7,649.68 | $ 2,942.31 | $ - | $ 10,591.99 |
| 9/1/2017 | $ 7,649.68 | $ 2,942.31 | $ - | $ 10,591.99 |
| 10/1/2017 | $ 7,649.68 | $ 2,336.97 | $ - | $ 9,986.65 |
| 11/1/2017 | $ 7,649.68 | $ 2,336.97 | $ - | $ 9,986.65 |
| 12/1/2017 | $ 7,649.68 | $ 2,336.97 | $ - | $ 9,986.65 |
| 1/1/2018 | $ 7,649.68 | $ 2,336.97 | $ - | $ 9,986.65 |
| 2/1/2018 | $ 7,649.68 | $ 2,336.97 | $ - | $ 9,986.65 |
| 3/1/2018 | $ 7,649.68 | $ 2,336.97 | $ - | $ 9,986.65 |
| 4/1/2018 | $ 7,649.68 | $ 2,336.97 | $ - | $ 9,986.65 |
| 5/1/2018 | $ 7,649.68 | $ 2,336.97 | $ - | $ 9,986.65 |
| 6/1/2018 | $ 8,133.44 | $ 2,336.97 | $ - | $ 10,470.41 |
| 7/1/2018 | $ 8,133.44 | $ 2,336.97 | $ - | $ 10,470.41 |
| 8/1/2018 | $ 8,133.44 | $ 2,336.97 | $ - | $ 10,470.41 |
| 9/1/2018 | $ 8,133.44 | $ 2,336.97 | $ - | $ 10,470.41 |
| 10/1/2018 | $ 8,133.44 | $ 1,995.46 | $ - | $ 10,128.90 |
| 11/1/2018 | $ 8,133.44 | $ 1,995.46 | $ - | $ 10,128.90 |
| 12/1/2018 | $ 8,133.44 | $ 1,995.46 | $ - | $ 10,128.90 |
| 1/1/2019 | $ 8,133.44 | $ 1,995.46 | $ - | $ 10,128.90 |
| 2/1/2019 | $ 8,133.44 | $ 1,995.46 | $ - | $ 10,128.90 |
| 3/1/2019 | $ 8,133.44 | $ 1,995.46 | $ - | $ 10,128.90 |
| 4/1/2019 | $ 8,133.44 | $ 1,995.46 | $ - | $ 10,128.90 |
| 5/1/2019 | $ 8,133.44 | $ 1,995.46 | $ - | $ 10,128.90 |
| Delinquency | | | | $ 367,225.47 |
| Less Suspense | | | | $ - |
| Total Delinquency | | | | $ 367,225.47 |



Exhibit C

# Broker Price Opinion

# 7798 NE Spanish Trail Ct, Boca Raton, FL 33487



CERTAINTY   INGENUITY   ADVANTAGE

Computershare

This analysis is not an appraisal. It is intended only for the purpose of assisting buyers or sellers or prospective buyers or sellers in deciding the listing, offering or sale price of the real property.

Represents Redacted Information

**Computershare**

Subject Property
7798 NE Spanish Trail Ct
Boca Raton, FL 33487

**BPO** BROKER PRICE OPINION

Inspection Date: 03/07/2019    (Exterior Form)

## Order Details

| | | | |
|---|---|---|---|
| Client: | SLS | Mortgagors Name: | STEPHEN ALLEN |
| Client Loan Number: | ▮▮▮▮ | Order Number: | ▮▮▮▮ |
| Tracking #1: | | Property ID: | |
| Broker Name: | Gregory Marchese | License Number: | ▮▮▮▮ |
| Broker Phone: | (954) 249-9405 | eSignature*: | (*Signature on File) |
| Broker Company: | Prestige Real Estate Group | Date Signed: | 03/07/2019 |
| Company Address: | Street Address: 2445 SW 18 Terrace #1009 | Subject Address: | Street Address: 7798 NE Spanish Trail Ct |
| | City, State Zip: Fort Lauderdale, FL 33315 | | City, State Zip: Boca Raton    FL    33487 |

## Subject Front



## Neighborhood



## Price Estimate

| AS-IS (60-90 Days) | $1,200,000 | Repaired (60-90 Days) | $1,200,000 |
|---|---|---|---|
| AS-IS (Quick Sale) | $1,190,000 | Repaired (Quick Sale) | $1,190,000 |

| | | | |
|---|---|---|---|
| Estimated Land Value | $480,000.0 | Total Repair Costs | $0 |
| PSF As-Is (Price per Sq Ft) | $306.28 | PSF Repaired (Price per Sq Ft) | $306.28 |

## General Information

| | | | |
|---|---|---|---|
| County | Palm Beach | Overall Condition | Average |
| Development or Neighborhood Name | None | Curb Appeal | Average |
| Zoning | Residential | Landscaping Condition | Average |
| | TROPIC ISLE 4TH SEC LOT 609 | | |
| Legal Description | | | |
| | | | |
| Homeowners Association | No | Secured | Yes |
| HOA Name | | Occupancy Status | Occupied |
| HOA Mgmt. Co, Name | | If "Occupied", by whom? | Owner |
| HOA Phone | | Subject conforms to neighborhood? | Yes |
| HOA Dues | | Are any Code Violations Posted? | No |
| HOA Dues Frequency | | Is the property subject to any rent controls? | Yes |
| | | Does the City or Municipality require | |
| HOA Dues Include | | Vacant Property Registration? | No |
| | | Site Influences | None |
| Environmental Hazards | None | | |

## Tax Data, Sales and Listing History

| | | | |
|---|---|---|---|
| Tax Assessed Value Date | 01/08/2017 | Last Known Sale Date | 04/24/2007 |
| Tax Assessed Value | 1,088,579 | Last Known Sale Price | 1,800,000 |
| Current Annual Real Estate Taxes | 20,680 | Taxes Delinquent? | No |
| Assessors Parcel Number (APN) | ▮▮▮▮ | Amount Delinquent | |
| Currently Listed for Sale (In MLS or FSBO) | No | | |
| Agent Name | | Original List Price | 1,995,000 |
| Agent Company | | Original List Date | |
| Agent Phone | | Current List Price | |
| DOM | | Current List Date | |
| Transaction Type | | Dwelling Access | |
| Listing Status | | MLS Number | |

Computershare

Subject Property
7756 NE Spanish Trail Ct
Boca Raton, FL 33487

BPO BROKER PRICE OPINION
(Exterior Form)

Inspection Date: 03/07/2019

## Neighborhood & Market Information

| | | | |
|---|---|---|---|
| Density | Suburban | Prior 12 Month Home Values Have | Increasing |
| Predominant Occupancy | Owner | At a Rate of | 5 |
| Neighborhood Values Low | 900,000 | Housing Supply of Similar Homes | In Balance |
| Neighborhood Values High | 1,500,000 | Typical Marketing Time | 90-120 Days |
| Predominant Value | 1,200,000 | Vandalism Present in Area | No |
| Number of Homes in Direct Competition | 20 | Average DOM Active Comps | 124 |
| Number of Similar Homes Sold in Last 6 Months | 15 | Average DOM Sold Comps | 90 |

**Neighborhood Comments**   Market has been stable for the past several months with a balance of homes and home prices. Subject is located in an established neighborhood that consists of homes of various ages, size & design.





| price | 454 | 506 | 509 | 630 | 586 | 764 | 1147 | 1018 | 827 | 702 | 559 | 689 | 695 | 756 | 672 | 634 | 706 | 868 |
| volume | 49 | 63 | 57 | 57 | 40 | 29 | 31 | 15 | 6 | 24 | 16 | 16 | 31 | 32 | 30 | 28 | 30 | 39 |

## Area Sales Data

| Inventory Analysis | Prior 7-12 Months | Prior 4-6 Months | Current - 3 Months | % Change | Overall Trend |
|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | 74 | 37 | 23 | -3 % | Stable |
| Absorption Rate (Total Sales/Months) | 12 | 12 | 8 | -3 % | Stable |
| Total # of Comparable Active Listings | 118 | 114 | 118 | -1 % | Stable |
| Months of Housing Supply (Total Listings/Absorption Rate) | 10 | 10 | 15 | 0 % | Stable |

| Median Sale & List Price, DOM, List to Sales Ratio | Prior 7-12 Months | Prior 4-6 Months | Current - 3 Months | % Change | Overall Trend |
|---|---|---|---|---|---|
| Median Comparable Sale Price | 585,000 | 701,000 | 500,000 | 5 % | Increasing |
| Median Comparable Sales DOM | 117 | 124 | 111 | -16 % | Decreasing |
| Median Comparable List Price | 1,069,500 | 1,194,500 | 1,275,000 | -11 % | Decreasing |
| Median Comparable Listings DOM | 95 | 90 | 99 | -13 % | Decreasing |
| Median Sale Price as % of List Price | 95 % | 94 % | 94 % | -2 % | Decreasing |

BPO Ext (2018)



**Subject Property**
7798 NE Spanish Trail Ct
Boca Raton, FL 33487

**BPO** BROKER PRICE OPINION

Inspection Date: 03/07/2019    (Exterior Form)

## Deferred Maintenance

**Deferred Maintenance Present or Repairs Needed?**    No

| # | Description | Cost | Comments |
|---|---|---|---|
| 1 | | $ | |
| 2 | | $ | |
| 3 | | $ | |
| 4 | | $ | |
| 5 | | $ | |
| 6 | | $ | |
| 7 | | $ | |
| 8 | | $ | |
| 9 | | $ | |
| 10 | | $ | |
| | **Total Repair Costs** | $ 0 | |

## Comparable Sales

| | Subject | Sale 1 | Sale 2 | Sale 3 |
|---|---|---|---|---|
| Street Address | 7798 NE Spanish Trail Ct | 904 Hyacinth Drive | 3628 S Ocean Boulevard | 759 NE 72nd Street |
| City, State Zip | Boca Raton, FL 33487 | Boca Raton, FL 33487 | Boca Raton, FL 33487 | Boca Raton, FL 33487 |
| Sale Date | 04/24/2007 | 11/19/2018 | 10/19/2018 | 11/19/2018 |
| Sale Price | 1,800,000 | 1,275,000 | 1,085,000 | 1,075,000 |
| Proximity To Subject (Miles) | | 0.61 mi N | 0.67 mi S | 0.43 mi SW |
| Condition | Average | Good | Average | Average |
| Data Source | Tax Records | MLS | MLS | MLS |
| Property Type | Single Family | Single Family | Single Family | Single Family |
| Property Style | 2 Story | 2 Story | 2 Story | 2 Story |
| Above Grade Sq Ft | 3,918 | 3,322 | 3,484 | 3,829 |
| # of Units | 1 | 1 | 1 | 1 |
| Lot Size | 12301 Sq Ft | 12301 Sq Ft | 12301 Sq Ft | 12301 Sq Ft |
| Year Built | 1979 | 1986 | 1999 | 1994 |
| Age | 40 | 33 | 20 | 25 |
| Total # Rooms | 8 | 8 | 8 | 9 |
| Bed / Full Ba. / Half Ba. | 4 / 3 / 0 | 4 / 4 / 1 | 4 / 4 / 0 | 4 / 4 / 1 |
| Financing Method | Conventional | Conventional | Conventional | Conventional |
| Transaction Type | Traditional Resale | Traditional Resale | Traditional Resale | Traditional Resale |
| Owner | Owner Occ | Owner Occ | Owner Occ | Owner Occ |
| Seller Concessions | 0 | 0 | 0 | 0 |
| Price Per Sq Ft | $459.42 | $383.80 | $311.42 | $280.75 |
| DOM | | 54 | 46 | 82 |
| List Price At Sale | | 1,379,000 | 1,299,000 | 1,295,000 |
| Original List Price | 1,995,000 | 1,379,000 | 1,439,000 | 1,295,000 |
| Original List Date | | 09/26/2018 | 09/03/2018 | 08/29/2018 |
| Basement | No | No | No | No |
| Basement Type | | | | |
| Basement Total Sq Ft | | | | |
| Basement Finished Sq Ft | 0 | | | |
| Garage Type | Attached | Attached | Attached | Attached |
| Number of spaces | 2 | 2 | 2 | 3 |
| Pool / Spa | In-ground | In-ground | None | In-ground |
| View | Water/Lake-front | Water/Lake-front | Residential | Water/Lake-front |
| Adjustment | | 1,460 | 6,340 | -5,000 |
| Adjusted Price | | 1,276,460 | 1,091,340 | 1,070,000 |

![Computershare]

**BPO** BROKER PRICE OPINION
Inspection Date:03/07/2019    (Exterior Form)

## Comparable Comments and Adjustment Justification

**Comparable Sale 1**

Inferior in GLA to the subject property. SPECTACULAR TWO STORY DEEPWATER HOME! BRAND NEW ROOF W COPPER ACCENTS! THIS REMODELED 4 BEDROOM BEAUTY FEATURES SOUTHERN EXPOSURE, GORGEOUS POOL AND SPA.
Adjusted for $5960 GLA,$500 bath, -$5000 condition.

**Comparable Sale 2**

Inferior in GLA to the subject property. Located in the seaside gated community of Ocean Grande this gorgeous home is one of 17 estate homes in the community. It has private beach access and boasts 4,122 tot sf with 4BD, 4BA, & private community pool.
Adjusted for $4340 GLA, -$1000 bath,-$2000 year built, $5000 pool.

**Comparable Sale 3**

Equal in GLA to the subject property. Fabulous East Boca Raton Dream Estate. Separate Guest Pool/House Pavilion with A/C Unit. 4 Bedroom, 4.1 Bath.
Adjusted for -$1500 bath,-$1000 year built, -$2500 garage.

## Comparable Listings

| | Subject | List 1 | List 2 | List 3 |
|---|---|---|---|---|
| | ![Subject] | ![List 1] | ![List 2] | ![List 3] |
| Street Address | 7798 NE Spanish Trail Ct | 7641 NE Morningside Terrace | 3539 Commodore Circle | 7751 NE Palm Way |
| City, State Zip | Boca Raton, FL 33487 | Boca Raton, FL 33487 | Boca Raton, FL 33487 | Boca Raton, FL 33487 |
| List Date | | 12/14/2018 | 10/18/2018 | 01/20/2019 |
| Current List Price | | 999,950 | 1,150,000 | 1,198,000 |
| Proximity To Subject (Miles) | | 0.19 mi W | 0.24 mi NE | 0.10 mi W |
| Condition | Average | Good | Average | Average |
| Data Source | Tax Records | MLS | MLS | MLS |
| Property Type | Single Family | Single Family | Single Family | Single Family |
| Property Style | 2 Story | 2 Story | 2 Story | 2 Story |
| Above Grade Sq Ft | 3,918 | 3,485 | 3,451 | 3,665 |
| # of Units | 1 | 1 | 1 | 1 |
| Lot Size | 12301 Sq Ft | 12301 Sq Ft | 12301 Sq Ft | 12301 Sq Ft |
| Year Built | 1979 | 1989 | 1999 | 1988 |
| Age | 40 | 30 | 20 | 31 |
| Total # Rooms | 8 | 8 | 8 | 8 |
| Bed / Full Ba. / Half Ba. | 4 / 3 / 0 | 4 / 3 / 1 | 4 / 3 / 0 | 4 / 3 / 1 |
| Transaction Type | Traditional Resale | Traditional Resale | Traditional Resale | Traditional Resale |
| Owner | Owner Occ | Owner Occ | Owner Occ | Owner Occ |
| Price Per Sq Ft | | $286.93 | $333.24 | $326.88 |
| DOM | 0 | 83 | 140 | 46 |
| MLS Status | | Active | Active | Active |
| Original List Price | 1,995,000 | 1,050,000 | 1,349,900 | 1,295,000 |
| Original List Date | | 12/14/2018 | 10/18/2018 | 01/20/2019 |
| Basement | No | No | No | No |
| Basement Type | | | | |
| Basement Total Sq Ft | 0 | | | |
| Basement Finished Sq Ft | 0 | | | |
| Garage Type | Attached | Attached | Attached | Attached |
| Number of spaces | 2 | 3 | 2 | 2 |
| Pool / Spa | In-ground | In-ground | In-ground | In-ground |
| View | Water/Lake-front | Water/Lake-front | Water/Lake-front | Water/Lake-front |
| Adjustment | | -4,670 | 2,670 | 2,030 |
| Adjusted Price | | 995,280 | 1,152,670 | 1,200,030 |

BPO Ext (2018)



**Subject Property**
7756 NE Spanish Trail Ct
Boca Raton, FL 33487

**BPO** BROKER
PRICE
OPINION

Inspection Date: 03/07/2019 (Exterior Form)

## Comparable Comments and Adjustment Justification

**Comparable List 1**
Inferior in GLA to the subject property. Location Location Location. East Boca Neighborhood walk to the beach and amenities. This home has been extensively renovated. Beautiful polished Travertine floors.
Adjusted for $4330 GLA, -$500 bath, -$1000 year built, -$2500 garage, -$5000 condition.

**Comparable List 2**
Inferior in GLA to the subject property. HUGE PRICE REDUCTION in this gorgeous "Royal Palm Custom Collection Home" in the Gated Boating Community of Pelican Harbor. Inclusive with purchase is a 75K DEEDED.
Adjusted for $4670 GLA, -$2000 year built.

**Comparable List 3**
Equal in bed count to the subject property. Unimaginable Outdoors Space. Come enjoy this outdoor Oasis Pool home"Boca's Best Back Yard" in East Boca. The home must have been built around the backyard that features a Large Pool, Koi Pond and almost 1,000 square feet of covered and screened in patio.
Adjusted for $2530 GLA, -$500 bath.

## Value Conclusion

| | | | |
|---|---|---|---|
| **As-Is (60-90 Days)** | $ 1,200,000 | **Repaired (60-90 Days)** | $ 1,200,000 |
| **As-Is (Quick Sale)** | $ 1,190,000 | **Repaired (Quick Sale)** | $ 1,190,000 |
| | **Estimated Land Value** | $ 480,000 | |

## Broker Addendum & Subject Comments

Subject's final value represents a value with normal marketing times and based on the most similar and proximate comps in this report. The subject property shows well, we recommend to sell the property As-Is.

Subject tax uploaded.

I searched back 6 months in the same neighborhood, un-gated community, within a one mile radius, in average condition,with gross living area +/- 20% of square footage +/-10% of year built, 20+/- of lot size and same bed bath count. Due to limited available market data for similar properties in the subject's immediate neighborhood, it was necessary to utilize good condition comps and made necessary adjustments for condition. There were no comps available in the same neighborhood. The best available comps are used in this report.

Due to limited available market data for similar properties in the subject's immediate neighborhood, it was necessary to utilize comps with a variance in GLA.

because subject is in a high net worth area, there is limited sales activity and in these price ranges have higher than normal price swings. previous report had different available comps that were available to use as opposed to comps that were able to be used in this report based on guidelines. should another report get completed at a later date it would not be unusual to have a similar price variance from report to report.

## Quality Control Reviewer Comments

Subject data is within tolerance of Collateral Analytics data. Subject photos match photos from a prior report. There is a value variance with the prior BPO, however the agent noted: "Because subject is in a high net worth area, there is limited sales activity and in these price ranges have higher than normal price swings. previous report had different available comps that were available to use as opposed to comps that were able to be used in this report based on guidelines. should another report get completed at a later date it would not be unusual to have a similar price variance from report to report."



**Subject Property**
7756 NE Spanish Trail Ct
Boca Raton, FL 33487

**BPO** BROKER PRICE OPINION

Inspection Date: 03/07/2019  (Exterior Form)

| State Mandated Disclosures | |
|---|---|
| **AR** | **Notwithstanding any preprinted language to the contrary, this opinion is not an appraisal of the market value of the property. If an appraisal is desired, the services of a licensed or certified appraiser must be obtained. Pursuant to Ark. Code. Ann. § 17-42-110(d), a broker price opinion or market analysis issued by a real estate licensee shall not contain the terms "market value", "appraised value" or "appraisal".** |
| **DE** | Notwithstanding any language to the contrary contained herein, this Competitive Market Analysis is NOT an appraisal of the market value for property and is not intended to be used for any legal purpose including approving a mortgage loan, modification of a mortgage loan, divorce/property separation, estate settlement, bankruptcy proceedings or any other purpose where real estate value is needed. If an appraisal is desired, the services of a licensed or certified appraiser must be obtained. |
| **ID** | This report is not intended to meet the Uniform Standards of Professional Appraisal Practice. This broker's price opinion is not intended to be an appraisal of the market value of the property, and that if an appraisal is desired, the services of a licensed or certified appraiser should be obtained by a licensee licensed under the Idaho real estate appraisers act, chapter 41 title 54 Idaho Code |
| **IL** | This is a broker price opinion/comparative market analysis, not an appraisal of the market value of the real estate, and was prepared by a licensed real estate broker or managing broker, not by a State certified real estate appraiser. |
| **MD** | This analysis is not an appraisal. It is intended only for the purpose of assisting buyers or sellers or prospective buyers or sellers in deciding the listing, offering, or sale price of the real property. |
| **ME** | **This opinion or appraisal was prepared solely for the client, for the purpose and function stated in this report and is not intended for subsequent use. It was not prepared by a licensed or certified appraiser and may not comply with the appraisal standards of the Uniform Standards of Professional Appraisal Practice.** |
| **MI** | **This is a market analysis, not an appraisal and was prepared by a licensed real estate broker or associate broker, not a licensed appraiser.** |
| **MN** | This opinion is not an appraisal of the market value of the property, and may not be used in lieu of an appraisal. If an appraisal is desired, the services of a licensed or certified appraiser must be obtained. |
| **MS** | This opinion is not an appraisal of the market value of the property, and may not be used in lieu of an appraisal. If an appraisal is desired, the services of a licensed or certified appraiser must be obtained. This opinion may not be used by any party as the primary basis to determine the value of a parcel of real property for a mortgage loan origination, including first and second mortgages, refinances or equity lines of credit.<br><br>The licensee who prepared this opinion certifies that he/she is covered by errors and omissions insurance, to the extent required by state law, for all liability associated with the preparation of the opinion. |
| **NC** | This opinion is not an appraisal of the market value of the property, and may not be used in lieu of an appraisal. If an appraisal is desired, the services of a licensed or certified appraiser shall be obtained. This opinion may not be used by any party as the primary basis to determine the value of a parcel of or interest in real property for a mortgage loan origination, including first and second mortgages, refinances, or equity lines of credit. |
| **NE** | **This opinion or analysis is not an appraisal. It is intended only for the benefit of the addressee for the purpose of assisting buyers or sellers or prospective buyers or sellers in deciding the listing, offering, or sale price of the real property, for lending purposes in a transaction other than a federally related transaction, or for real property tax appeal purposes. This opinion or analysis is not governed by the Real Property Appraiser Act.** |
| **NV** | **This opinion is not an appraisal of the market value of the property, and may not be used in lieu of an appraisal. If an appraisal is desired, the services of a licensed or certified appraiser shall be obtained.** |
| **OR** | If licensee is also licensed by the Appraiser Certification and Licensure Board, the report is not intended to meet the requirements set out in the Uniform Standards of Appraisal Practice. This competitive market analysis or letter opinion is not intended as an appraisal and if an appraisal is desired, the services of a competent professional licensed appraiser should be obtained. |
| **PA** | This analysis has not been performed in accordance with the Uniform Standards of Professional Appraisal Practice which require valuers to act as unbiased, disinterested third parties with impartiality, objectivity and independence and without accommodation of personal interest. It is not to be construed as an appraisal and may not be used as such for any purpose. |
| **SC** | This market analysis may not be used for the purposes of obtaining financing in a federally related transaction. |
| **TX** | **THIS IS A BROKER PRICE OPINION OR COMPARATIVE MARKET ANALYSIS AND SHOULD NOT BE CONSIDERED AN APPRAISAL OR OPINION OF VALUE. In making any decision that relies upon my work, you should know that I have not followed the guidelines for development of an appraisal or analysis contained in the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation.** |
| **WA** | This brokers price opinion is not an appraisal as defined in chapter 18.140 RCW and has been prepared by a real estate licensee, licensed under chapter 18.85 RCW, who is not also state-certified or state-licensed as a real estate appraiser under chapter 18.140 RCW. |
| **WY** | This is an opinion of price and is not a certified appraisal of the market value of the property. If such an appraisal is desired, the service of a certified appraiser must be obtained. |

**Subject Property**
7798 NE Spanish Trail Ct
Boca Raton, FL 33487

Computershare

**BPO** BROKER PRICE OPINION

Inspection Date: 03/07/2019    (Exterior Form)

### General Addendum

This document is not an appraisal as defined by USPAP (Uniform Standards of Professional Appraisal Practice). It is not to be construed as an appraisal and may not be used as such for any purpose. The intended user of this report is the Client(s) named above and is to be used at the Client(s) sole discretion. This report is not intended as any guarntee of value and/or condition of the subject property and should not be relied on as such. Any opinion rendered in this report is that of the report preparer and does not necessarily reflect the views and opinions of Computershare LLC  or its owners, affiliates and or assigns. All data contained herein is deemed accurate and reliable but not guaranteed.

Copyright (C) Computershare LLC

### Proximity Map



| Subject | 7798 NE Spanish Trail Ct | Boca Raton, FL 33487 | Proximity |
|---|---|---|---|
| Sold Comp 1 | 904 Hyacinth Drive | Boca Raton, FL 33487 | 0.61 mi N |
| Sold Comp 2 | 3628 S Ocean Boulevard | Boca Raton, FL 33487 | 0.67 mi S |
| Sold Comp 3 | 759 NE 72nd Street | Boca Raton, FL 33487 | 0.43 mi SW |
| List Comp 1 | 7641 NE Morningside Terrace | Boca Raton, FL 33487 | 0.19 mi W |
| List Comp 2 | 3539 Commodore Circle | Boca Raton, FL 33487 | 0.24 mi NE |
| List Comp 3 | 7751 NE Palm Way | Boca Raton, FL 33487 | 0.10 mi W |

### Subject Aerial View





**Computershare**

**BPO** BROKER PRICE OPINION

Inspection Date: 03/07/2019    (Exterior Form)

**Subject Property Photos**

**Front View**



**Left Side**



**Right Side**



**Street View**



**Address Verification**



**Comparable Property Photos**

### Sale 1



904 Hyacinth Drive
Boca Raton, FL 33487
Sold for $1,275,000 on 11/19/2018

### List 1



7641 NE Morningside Terrace
Boca Raton, FL 33487
Listed for $999,950 on 12/14/2018

### Sale 2



3628 S Ocean Boulevard
Boca Raton, FL 33487
Sold for $1,085,000 on 10/19/2018

### List 2



3539 Commodore Circle
Boca Raton, FL 33487
Listed for $1,150,000 on 10/18/2018

### Sale 3



759 NE 72nd Street
Boca Raton, FL 33487
Sold for $1,075,000 on 11/19/2018

### List 3



7751 NE Palm Way
Boca Raton, FL 33487
Listed for $1,198,000 on 01/20/2019



**Subject Property**
7758 NE Spanish Trail Ct
Boca Raton, FL 33487

**BPO** BROKER PRICE OPINION
Inspection Date: 03/07/2019 (Exterior Form)

**Additional Photos**